IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JASON D. NICHOLS,

       Plaintiff,       OPINION AND ORDER

  v.

                   11-cv-697-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

---

   Pursuant to 42 U.S.C. § 405(g), Jason Nichols asks this court to reverse an adverse decision by the Commissioner of Social Security, finding that he is not disabled and, therefore, not eligible for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act, codified at 42 U.S.C. §§ 416(I), 423(d) and 1382(c)(3)(A).  Nichols contends that the decision:  (1) improperly disregarded his treating physicians' testimony by mischaracterizing it as unsupported by the medical record and inconsistent with other evidence; (2) failed to consider the impact of Nichols' obesity on his pain and ability to perform sedentary work tasks; and (3) lacked evidentiary support in finding his hearing testimony not credible.  Because the court agrees with Nichols on all three points, it will reverse the Commissioner's determination and remand for further proceedings consistent with this opinion.

FACTS[1]

## A.  Background and Procedural History

Jason Nichols was born on September 20, 1972.  (AR 39)  He is a high school graduate with a past relevant work history as a bricklayer, construction laborer and truck loader.  (AR 39, 44, 114.)  Nichols first applied for Social Security Disability Insurance benefits on March 30, 2006, alleging an injury onset date of September 16, 2005.  (AR 112.)  After the local disability agency denied his application initially and again upon reconsideration, Roberts requested a hearing.  On March 4, 2009, Administrative Law Judge ("ALJ") Sherwin Biesman convened a video hearing and took testimony from Nichols about the extent of his disability.  (AR 37-58.)  In a decision dated April 17, 2009, the ALJ issued a written decision, finding Nichols not disabled.  (AR 15-29.)  This decision became final on June 14, 2011, when the Appeals Council denied Nichols' request for review.  (AR 1.)

## B.  Medical Evidence

### i.   Symptoms, Tests, and Diagnoses

Nichols' primary medical complaint has to do with lower back pain.  His medical file begins in September 20, 2005, with a letter from Dr. David Nanstad, Nichols' treating chiropractor, stating that Nichols had come in with a work injury to his back suffered on September 16, 2005.  (AR 188.)  Six days later, Dr. Nanstad documented that Nichols was still in a great deal of pain with limited motion.  (AR 195.)  Dr.

---

[1] The following facts are drawn from the Administrative Record (AR), as well as from Nichols' supporting brief for summary judgment to the extent undisputed by the Commissioner.

Nanstad recommended an MRI of the spine (AR 188) and treatment by a pain management specialist (AR 195).

For the next two years, Nichols was seen by numerous doctors, all of whom noted in their treatment records some combination of the same essential set of symptoms: lower back pain, limited motion, an unsteady gait, numbness and weakness in the left leg, and at times pain radiating down both legs. Nichols' reports of lower back pain were confirmed on January 12, 2006, when he underwent a three level discography that showed severe pain at the L5-S1 level with diffuse disc degeneration as a potential source of pain. (AR 211-212.) Between 2005 and 2007, Nichols also had several MRIs and CT scans of the lower back. The MRI tests showed degenerative disc dehydration and disc bulging at L4-5 and L5-S1, with a small annular (ring shaped) tear at L5-S1. (AR 272, 270, 269.) CT scans showed bulging discs at L3-4, L4-5, and L5-S1, most severe at L4-5, and annular fibrosis at L5-S1. (AR 268, 217.)

Nichols' treating and examining physicians have labeled his back problem by various terms, including (1) disc herniation, (2) disc disruption, (3) disc bulging with evidence of an annular tear, and (4) degenerative disc disease. For example, on September 26, 2005, after consulting the MRIs and conducting a physical examination in which he found negative straight leg raising bilaterally, Dr. Jeffrey Shepich, a family practitioner, diagnosed Nichols with lower back pain and lumbar disc herniation. (AR 306.) On November 22, 2005, and again on January 6, 2006, Dr. Larry Studt, a family practitioner, also diagnosed lumbar disc herniation. (AR 409, 438.) However, Dr. Thomas Zdeblick, an examining orthopedic surgeon, evaluated Nicholson a May 5, 2006,

and found degenerative disc disease but no disc herniation and no nerve root impingement. (AR 230.) In a still different diagnosis, in a letter dated August 29, 2006, Dr. Shepich described Nichols' injury as an L5-S1 annular tear associated with internal disc disruption but did not mention disc herniation. (AR 265.) On July 24, 2007, Dr. Joseph Hebl, an occupational medicine specialist, evaluated Nichols and after an in-person examination and review of the records diagnosed Nichols with chronic debilitating low back pain secondary to a herniated disc. (AR 379-391.)

### ii. Treatment

Over the three-year course of treatment also documented in the record, Nichols was prescribed several different medications to deal with his back pain. At one time or another, Nichols was prescribed Flexeril (AR 306), Vicodin (AR 306), Darvocet (AR 307), MS Contin (AR 313), Methadone (AR 328), Lortab (AR 334), and Percocet (AR 558). On September 28, 2005, Nichols also underwent a selective interlaminar injection for pain at L5-S1, performed by Dr. Stephen Endres. (AR 215.) On October 19, 2005, Dr. Endres performed an epidural steroid injection at L5-S1. (AR 214.) At a follow-up visit on October 26, 2005, Nichols stated that this injection only provided relief for approximately one day. (AR 213.) Apparently as a result, Dr. Studt prescribed a TENS unit for pain on November 22, 2005. (AR 415.)

Despite his ongoing pain, Nichols has been rejected as a candidate for therapeutic surgery. On March 18, 2006, Dr. Kamal Thapar suggested that Nichols might undergo a surgical disc replacement, but Nichols at first expressed hesitance. (AR 258.) Within a few months, however, Nichols had a change of heart. He was then evaluated for surgery

4

by Dr. Thomas Zdeblick on May 5, 2006.  (AR 229.)  Dr. Zdeblick stated that some of Nichols' leg symptoms could not be explained given his lack of nerve root impingement, and opined that surgery to replace or fuse his disc was not an option due to Mr. Nichols' obesity.  (AR 230.)  Zdeblick, therefore, recommended weight loss through a therapy program, which would make Nichols a better surgical candidate.  (AR 230.)  Dr. Thapar again evaluated Nichols for surgical candidacy on August 3, 2006, but agreed with Dr. Zdeblick that surgery would be unhelpful because of Mr. Nichols obesity.  (AR 261.)  Dr. Thapar stated that Nichols' only option for surgery was to lose weight and improve his physical fitness.  (AR 261)  Finally, Dr. Steven Swanson, a neurosurgeon, evaluated Nichols on November 2, 2006, regarding possible lumbar fusion surgery.  (AR 279). He, too, agreed that surgery was not recommended because of the risk of failure due to Nichols' obesity.  (AR 279.)

### iii.   Physical Capacity Assessments

On November 11, 2005, Dr. Studt, one of Nichols treating doctors, examined Nichols and opined that he should be limited to "sedentary" activities with limited sitting, driving, standing and walking, and the ability to alternate at will between sitting and standing.  (AR 409.)  On each of five more visits between December 6, 2005, and May 10, 2006, Dr. Studt found Nichols limited to "sedentary" activities, with only occasional (defined as limited to only 11-33% of the day) sitting, standing, and walking. (AR 422, 438, 461, 466, 474, 479.)  On May 31, 2006, Dr. Studt gave a slightly improved prognosis when he completed a "Return to Work/Physical Capabilities" form for Nichols and found him able to walk frequently (34-66% of the time).  (AR 482.)  Dr.

Studt confirmed this improved functional assessment in his office visit notes until September 1, 2006.  (AR 488, 494, 497, 500.)

On June 8, 2006, the state Social Security office handling Nichols' disability claim sent Nichols' medical file to agency physician Dr. Zhen Lu for a Residual Functional Capacity evaluation.  Dr. Lu opined that Nichols could: occasionally lift 20 pounds; frequently lift 10 pounds; stand for six out of eight hours in a day; sit for eight hours in a day; and perform unlimited pushing and pulling.  (AR 235.)  Dr. Lu also found that there were no other appropriate limitations applicable to Nichols.   (AR 237-38.)   On November 2, 2006, agency physician Dr. Michael Baumblatt reviewed Dr. Lu's assessment and seconded his conclusions.  (AR 274.)

On July 11, 2006, Dr. Studt completed a "Worker's Compensation Injury Report," which cleared Nichols for a return to "light" work, with "occasional" sitting, bending and climbing, and "frequent" walking.  (AR 502.)  He filled out an identical report on August 22, 2006.  (AR 504.)  However, in contrast to Dr. Studt's positive opinion, on August 29, 2006, Dr. Shepich, Nichols' other treating doctor, wrote a letter on Nichols' behalf to the disability agency, reporting that Nichols was being treated for intractable low back pain, that this condition severely interfered with his capacity to work, and required chronic narcotic medication.  (AR 265.)  Dr. Shepich opined that Nichols was disabled.  (AR 265.)

On November 6, 2006, Nichols' treating physician, Dr. Studt, completed a Physical Residual Functional Capacity questionnaire for Nichols that was much less sanguine than his July and August assessments.  (AR 295.)  Dr. Studt estimated that in a

competitive work environment, Nichols would be able to, at most, sit and stand for 20 minutes at a time, and in total less than two hours in an eight-hour day.  (AR 296.)  He further stated that Nichols must walk for five minutes every 20 minutes to relieve pain from sitting, and needed a job where he was allowed to shift between sitting, standing and walking at will, take unscheduled breaks for up to an hour during the day, elevate his legs while sitting, and use a cane while walking.  (AR 296.)  Ultimately, Dr. Studt concluded that Nichols would be able to work in a sedentary position for a couple of days each week, for a couple of hours per day.  (AR 298.)  Studt also opined that Nichols' pain and other symptoms were "constantly" severe enough to interfere with his attention and concentration.  (AR 295.)

On January 25, 2007, Nichols visited Dr. Studt to "discuss the discrepancies between" the July and August Workers Compensation Reports (which appeared to clear him for light duty) and the November 6, Physical Residual Functional Capacity questionnaire (which appeared to restrict him from performing even sedentary work on a full-time basis).  (AR 506.)  Dr. Studt stated that the earlier Workman's Compensation Restrictions were "meant to estimate what the patient can hopefully get up to when pushed to the limits . . . [whereas the later] Residual Functional Capacity Questionnaire was filled out at the patient's current level."  (AR 506.)  In a letter dated April 9, 2007, Dr. Studt further clarified that the earlier "light duty" clearance was only meant to describe what Nichols could work up to or do over a short period of time, whereas the Physical Residual Functional Capacity Questionnaire was meant to describe his capabilities in a sustained work environment.  (AR 301.)

On July 24, 2007, Dr. Joseph Hebl, an occupational medicine specialist, evaluated Nichols at the request of Dr. Shepich, another of Nichols' treating physicians.  (AR 379-391.)  Dr. Hebl gave Nichols a physical examination and reviewed his medical records.  (AR 379).   Hebl specifically noted Dr. Studt's inconsistent evaluations of Nichols' functional capacity, but (1) expressed agreement with the limitations found in the November 6, 2006, Residual Functional Capacity report, and (2) strongly disagreed with the evaluation clearing Nichols for "light" work.  (AR 380.)   Noting that he ordered similar functional capacity tests frequently, Dr. Hebl also explained that Nichols' capacity to work over four hours could *not* be extrapolated to a 40-hour workweek.  (AR 380.)  Finally, Dr. Hebl's examination revealed tenderness across the lower lumbar spine with very limited range of motion in all directions, difficulty getting up from the chair to walk, use of a cane for ambulation, an unsteady gait, an inability to heel and toe walk, an inability to squat, and positive straight leg raising.  (AR 382.)  Based on his examination, he opined that Nichols was totally disabled.  (AR 382.)

In a letter dated February 25, 2009, Dr. Shepich reported that Nichols continued to be treated for his usual discogenic low back pain.  (AR 573).  He noted that Mr. Nichols' injury had resulted in limitations due to depression, anxiety, weight gain, and medication side-effects, and stated that Mr. Nichols had been "very compliant with all treatment options and continues to pursue physical therapy and counseling."  (AR 573.)  Dr. Shepich considered Nichols totally disabled and expected to remain disabled indefinitely.  (AR 573.)

### C. Third Party Functional Capacity Report & Physical Activity Questionnaire

On May 2, 2006, Nichols' (then) wife Debra filled out a "Third Party Function Report," describing his daily routine.  In the report, she stated that Nichols was able to feed and clean himself, make simple meals, drive his car, do light housekeeping and help care for their son.  (AR 128-33.)  However, Nichols was unable to walk the dog, clean the dog kennel, do the laundry, do the dishes, vacuum, carry grocery bags, do yard work, participate in active recreation or drive for long distances at a stretch.  (AR 128-33.)  He was able to walk 1-2 blocks before needing rest.  (AR 133.)

The same day, Nichols filled out a physical activity questionnaire to document his version of the extent of his disability.  (AR 141.)  He stated that he experiences pain whenever he stands or sits for extended periods of time or walks for long distances, that his pain causes disturbed sleep, and that he will wake up 2-4 times a night.  (AR 141.)  Nichols stated that he is able to sit for half an hour at a time if allowed to frequently change positions, stand for half an hour by frequently moving and changing posture, and walk 1-2 blocks with a cane.  (AR 142.)  Depending on his daily pain levels, he is able to drive or sit in a car for up to one hour.  (AR 142.)

In an undated disability report filed to the Social Security Disability Office, Nichols repeated the same basic pain symptoms and restrictions set out above.  (AR 151.)  But Nichols also stated that he has occasional good days -- or blocks of time in a day when he feels better -- but then will suffer extreme pain the next day.  He also stated that it is impossible to predict when the pain will appear or intensify.  (AR 151.)  While Nicholds said that mornings are the worst for his pain, he also averred that "most

afternoons at some point I need to lay down to get my legs up to relieve leg pain." (AR 151.)

### D. Hearing Testimony

At the August 20, 2009, administrative hearing, Nichols testified that he was taking pain medication several times a day; his medication use varied depending on whether he was having a "good" or "bad" day for pain; and most of his days qualified as "bad" days. (AR 42.) Nichols described doing some chores around the house, such as watching his son and cooking, but explained that he could not do laundry or dishes. (AR 43-44.) He further testified that between three to five days a week he needs to lie down with his feet up for an hour or two to relieve his back pain. (AR 45-46.) Although acknowledging that he was told to lose weight, Nichols also testified he had not been able to do so because of his inability to exercise, explaining that there are many days where he cannot do even light household chores. (AR 46.) Finally, he testified that his back trouble has greatly impacted his social life, preventing him from actively participating in recreational activities and, at times, even from sitting at a table to enjoy a meal with his family. (AR 47-48.)

### E. Administrative Law Judge's Decision

After considering the documentary evidence and Nichols' testimony, the ALJ issued a written decision on April 17, 2009, finding that Nichols was not disabled under the Social Security Act using the standard sequential, five-step analysis. *See* 20 C.F.R. §§

404.1520.   At step one, the ALJ found that Nichols had not engaged in substantial gainful employment since September 16, 2005, the alleged onset date of disability.[3]  (AR 20.)   At step two, the ALJ found that Nichols had two severe impairments: obesity and lumbar spine degenerative disc disease.[4]  (AR 22.)  He determined that both had "more than a minimal impact on [Nichols'] ability to lift/carry and remain on his feet for prolonged periods."  (AR 22.)  The ALJ also found that Nichols suffered from mild depression and anxiety, but characterized these as non-severe impairments.  (AR 23.)

At step three, the ALJ found that neither of Nichols' two severe impairments were listed in 20 C.F.R. 404, Subpart P, Appendix 1, and that individually and in combination his impairments were not the equivalent of any of the listed impairments.  (AR 22.)  The ALJ specifically noted the absence of any medical documentation showing that Nichols' lumbar spine impairment was producing nerve root compromise, positive radicular pain, spinal arachnoiditis, or lumbar spinal stenosis that would meet or equal Medical Listing 1.04.  (AR 24.)

After completing step three, the ALJ paused to assess Nichols' Residual Functional Capacity by considering the level of work activities that he could perform on a sustained basis despite the limitations posed by his impairments.[6]  The ALJ determined that

---

[3] "Substantial gainful activity" is employment that involves doing significant physical or mental activities for pay or profit.  20 C.F.R. § 404.1572.

[4] An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

[6] "Residual functional capacity" or RFC generally means "the most [the claimant] can still do despite [her] limitations."  *Weatherbee v. Astrue*, 649 F.3d 656, 659 n.2 (7th Cir. 2011) (quoting 20 C.F.R. §§ 404.1545(a), 416.945(a)).  An RFC assessment considers

Nichols was capable of the full range of sedentary work.  (AR 27.)  On the basis of this finding, at step four he determined that Nichols would not be able to perform any of his past jobs, all of which required heavy and very heavy exertion.  (AR 28.)  At step 5, the ALJ noted the significant number of sedentary jobs in the national economy, ultimately deciding that Nichols was not disabled because he could perform these jobs.  (AR 27-28.)

In determining that Nichols was capable of sedentary work, the ALJ first noted that Nichols chiefly complained of daily back pain, some days worse than others, which limited his ability to perform physical activity above a certain level and made it difficult to sit or stand in one position for an extended period.  (AR 25.)  The ALJ considered Nichols' medical diagnoses and determined that his impairments could reasonably be expected to produce his claimed symptoms.  (AR 25.)  Nevertheless, the ALJ decided that Nichols' claims about the intensity, persistence and limiting effects of his symptoms were not actually supported by the evidence.  (AR 25-26.)

In rejecting Nichols' claims, the ALJ first recounted his hearing testimony about narcotic pain medicine use, efforts to control his weight, habit of walking for exercise, sleep habits, frequency of bad days, and ability to do light household chores.  (AR 24-25.)  The ALJ also recounted similar statements Nichols made in his 2006 physical activities questionnaire, including his tolerance for sitting in a car during long drives,

---

the claimant's ability to perform sustained, work-related physical and mental activities in light of his or her impairments.  Social Security Rule (SSR) 96-8p.  A claimant's RFC is frequently expressed in terms of exertional (physicial) and non-exertional (mental) levels. 20 C.F.R. § 404.1567.  As it pertains to this case, the five increasingly difficult exertional levels of work are characterized as sedentary, light, medium, heavy, and very heavy.  *Id*. at § 404.1567(a)-(e).

sleep habits, ability to walk 1-2 blocks with a cane, and need to change positions every 20-30 minutes. (AR 25.)   However, the ALJ rejected Nichols' testimony about his own level of pain as not credible.  (AR 27.)   He noted the evidence which tended to show that Nichols could perform sedentary activity, including his ability to perform light, non-strenuous household chores, go shopping, and perform personal care and grooming tasks. (AR 27.)   He also noted the significance of Nichols' so-called "lifestyle choice" not to cure his obesity, which appeared to contribute to his back pain.  (AR 27.)

The ALJ acknowledged that Nichols' treating physicians, Dr. Shepich and Studt, and examining physician, Dr. Hebl, had assessed him as unable to sustain employment. (AR 25.)   Despite the greater weight afforded to treating physicians' opinions and his own burden of setting out clear and convincing reasons for disregarding the treating physician's opinions, the ALJ still chose to disregard these opinions because they were internally inconsistent and were not compatible with diagnoses given by the surgeons who evaluated Nichols for back surgery.  (AR 26.)   The ALJ also pointed out that all of the medical records demonstrate that Nichols (1) has retained normal neurological functioning in tests designed to measure the level of impairment to his lower back; (2) has been conservatively treated for his pain with medication and physical therapy; and (3) had not been prescribed a cane, had been recommended (but not ordered) to lose weight, and had no apparent need for surgery.  (AR 26.)   The ALJ further pointed out that Nichols' examining physician, Dr. Hebl, did not offer a specific assessment of Nichols' functional limitations to support his general statement that Nichols could not work.  (AR 26.)   Finally, the ALJ emphasized the inconsistent records of Dr. Studt, who

in July and August of 2006 cleared Nichols for "light" duty, only to change his mind in November and declare him unable to work.  (AR 26.)

All of this apparently led the ALJ to conclude that "the treating physicians appear to have taken the claimant's subjective allegations at face value and merely reiterated those allegations in their reports."  (AR 26-27.)  Ultimately the Commissioner of Social Security refused to revisit the ALJ's findings and conclusions, making those the Commissioner's final findings and conclusions as well.

OPINION

The standard by which a federal court reviews a final decision by the Commissioner is well settled: the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."   42 U.S.C. § 405(g).   Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).  The court's review is limited to the reasons articulated by the ALJ in his decision.  *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision.  *Id.*  The decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to her conclusion.  *Zurawski*, 245 F.3d at 887.

Nichols' principal argument on appeal is that the ALJ erred in finding him capable of sedentary work.  Although Nichols acknowledges being able to perform light tasks around the house, he argues that he would be unable to perform sustained work over a 40-hour work week, because he must take unscheduled breaks to lie down and elevate his feet, and cannot usually stay sitting or standing on place for more than half an hour, and would need to take regular walking breaks.  Nichols testified to these limitations at the hearing, and his treating physicians confirm them, but the ALJ disagreed.  In Nichols' view, this constituted reversible error on three separate grounds: (1) the ALJ failed to follow the treating physician rule; (2) the ALJ failed to consider his obesity; and (3) the ALJ failed to properly evaluate his credibility. The court considers each of these grounds in turn.

## I.  Failure to Follow the Treating Physician Rule

Nichols' first contention of error is that the ALJ failed to follow the "treating physician rule" by rejecting the consensus of his treating physicians, Dr. Studt and Dr. Shepich.  These doctors generally opined that Nichols was disabled, but also made more

specific observations about his functional capacity (for example, his ability to sit or stand without breaks).

An "ALJ is not required to give controlling weight to the ultimate conclusion of disability -- a finding specifically reserved for the Commissioner." *Denton v. Astrue,* 596 F.3d 419, 424 (7th Cir. 2010); *see also* 40 C.F.R § 404.1527(d).  Instead, the treating physician rule states that with respect to specific medical findings regarding "the nature and severity of [the] impairment," a

> treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." An ALJ "must offer 'good reasons'" for discounting a treating physician's opinion.

*Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (internal citations omitted); *see also* 40 C.F.R. § 404.1527(c)(2).  The ALJ paraphrased this test in his opinion, but he erred in applying it when he disregarded the functional capacity findings of Nichols' two treating physicians.

*First*, the ALJ found that "the medical findings submitted by these physicians and otherwise documented in the record do not support a finding that the claimant's medical condition is of disabling severity."  (AR 26.)  Implying that the test results did not show a degree of injury capable of producing the pain symptoms credited by the treating physicians, the ALJ noted in particular that (1) the diagnostic imaging reports do not mention "herniated discs" or any neurological abnormalities, and (2) the record shows that Nichols "retained normal neurological functioning (e.g. motor strength, sensation, reflexes) with no signs of positive straight leg raising."  (AR 26.)

While the ALJ focused on the (arguable) absence of herniation, spinal stenosis, or nerve root impingement, Nichols maintains that his doctors correctly diagnosed him with disc herniation based on the test results, and notes that "herniation" and "bulging with a cartilage tear" may mean virtually the same thing.  Although this dispute comes down to a matter of medical judgment, Nichols has a point.  The ALJ neither addressed the test results that indisputably showed degenerative disc dehydration, disc bulging at L5-S1, and a small annular tear, nor explained why these undisputed ailments would be insufficient to cause Nichols' level of pain.  Further, the ALJ appears to have drawn his own conclusions with respect to the medical evidence, which he is not allowed to do in the absence of a medical expert or clear, contradictory medical evidence.  *Chase v. Astrue*, 458 Fed. Appx. 553, *3 (7th Cir. Jan. 30, 2012) (ALJ "may not 'play doctor' by using his own lay opinions to fill evidentiary gaps in the record"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").  Regardless, the ALJ's failure to even discuss the disc bulging and degenerative disease underscores his failure to account for medical evidence supporting Drs. Studt's and Shepich's findings as the treating physicians.  This was error.  See *Heron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (ALJ may not "select and discuss only that evidence that favors his ultimate conclusion.").

*Second*, the ALJ found that the treating physicians' "assessment of the claimant's residual functional capacity [was not] compatible with" other evidence in the record.  In particular, the ALJ noted that "when referred to outside medical sources for examination, the claimant generally failed to given an impression that his back pain was as significant

as he alleged."  The ALJ pointed out that Dr. Zdeblick, an orthopedic surgeon who examined Nichol's for possible surgery, (a) found no explanation for some of Nichols' leg pain symptoms, (b) "did not see the need for surgery," and (c) advised Nichols to lose weight and increase exercise.  Similarly, the ALJ cited to the assessment of neurosurgeon Dr. Swanson, who had recommended against surgery and suggested Nichols might be exaggerating his pain.  The ALJ also pointed to the apparent inconsistency in Dr. Studt's own assessment of Nichols' capacity in July and August of 2006, compared to his assessment in November, 2006.  Finally, the ALJ pointed out that Nichols' own daily activity log demonstrated he was capable of occasional light chores around the house, an indication that he would be capable of less strenuous sedentary work.

An ALJ "must offer 'good reasons'" for discounting a treating physician's opinion.  *Larson*, 615 F.3d at 749.  None of the reasons offered by the ALJ qualify.  The problem with the ALJ's comparison of the reports written by Drs. Zdeblick and Swanson with the opinions of treating physicians Drs. Studt and Shepich is that none of their observations actually conflict with regard to Nichols' functional capacity assessment.  Zdeblick's and Swanson's notes reflect surgical consultations, not functional capacity assessments.  The notes certainly contain diagnostic components, but none even purport to assess Nichols' functional capabilities or pain in the work setting.  At most, these notes suggest that (1) Nichols may have been somewhat exaggerating his pain; and (2) Nichols suffered from degenerative disc disease, rather than a herniated disc.  Contrary to the ALJ's mischaracterization of the record, the records do *not* suggest that surgery was considered unnecessary because of Nichols' limited symptoms.  Instead, the neurosurgeons Nichols

consulted declined to recommend surgery because they did not think disc fusion or replacement surgery would be possible given his size. (AR 230, 261, 280.) Moreover, there is nothing in these pre-surgical notes that is directly relevant to Nichols' pain threshold and, more to the point, whether Nichols had the ability to sit and stand for prolonged periods.

The other evidence identified by the ALJ as "inconsistent" with Nichols' claimed disability was Dr. Studt's own functional capacity evaluations in July and August of 2006, clearing Nichols for "light work." In giving weight to this evidence, the ALJ overlooked (or at least failed to discuss) the fact that Dr. Studt had expressly addressed the significance of these reports in a later medical visit, explaining that these evaluations were "meant to estimate what the patient can hopefully get up to when pushed to the limits." (AR 506.) Dr. Studt clarified that his later "Residual Functional Capacity Questionnaire was filled out at the patient's current level." (AR 506.) The ALJ was not required to credit Dr. Studt's explanation for the inconsistency, but his failure to even address it suggests he did not properly consider all of the relevant evidence. This, too, was error. *See* 20 C.F.R. § 404.1520b ("[W]e review all of the evidence relevant to your claim . . . .") Furthermore, even taking the July and August evaluations as gospel, these evalutions still limited Nichols to only "occasional" sitting, yet the ALJ failed to consider whether this restriction would be compatible with a sedentary work.[2]

---

[2]   Although the ALJ did not discuss it in the analysis portion of his opinion, there is evidence in the record that directly contradicts the treating physicians' functional capacity determination: the Residual Functional Capacity (RFC) evaluations performed by non-examining physicians Zhen Lu and Michael Baumblatt. (AR 235, 274). Still, these opinions do not garner much weight considering that these doctors made functional

*Third*, the ALJ found that the treating physicians' functional capacity evaluations conflicted with Nichols' daily schedule of home activities.  Rejecting Drs. Studt's and Shepich's conclusion that Nichols was unable to work any sort of full time sedentary job, the ALJ reasoned that because Nichols was able to do occasional chores around the house at a light exertion level, he should be able to do sedentary activity consistently for an eight-hour day.  There is, however, no equivalence between a full time job that would not allow limited opportunities for rest and Nichols' home schedule, where he did perform some light tasks but was allowed to change positions, lie down, elevate his feet, and even go to bed as necessary.  *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (finding error when the ALJ placed undue weight on claimant's activities inside the home as consistent with working outside the home); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (it is not enough to describe a claimant's activities without explaining how they are inconsistent with the limitations claimed).  Therefore, evidence of Nichols' daily schedule does not conflict with his treating doctors' functional capacity determination.

Finding that the ALJ appears not to have considered all of the evidence, failed in any event to address much of it, reached his own conclusions with respect to the meaning of the medical evidence, and relied on evidence that did not actually conflict with the opinions presented by the treating physicians, the court concludes that the ALJ materially erred in not giving controlling weight to Drs. Shepich's and Studt's assessment of Nichols' ability to engage in sustained sitting or standing work during a regular work

---

capacity evaluations based merely on Nichols' medical tests, having never evaluated Nichols one-on-one, which may explain why the ALJ chose not to cite this evidence in support of his reasoning.

week.[3]   Even if the ALJ had good grounds for his decision not to give the treating physicians' assessment *controlling* weight, he failed in his duty to explain how much weight he was giving to the assessment and why.   The applicable regulations identify a checklist of several factors that an ALJ must consider in deciding how much weight to get a treating physician's opinion: "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion."   *Larson*, 615 F.3d at 751; *see also* 20 C.F.R. §§ 404.1527(c)(2)(i) & (ii).   Other than addressing the "consistency and support for the physician's opinion," the ALJ did not attempt here to discuss any of these additional factors.   This, too, was error.   See *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play").

## II. Failure to Consider Nichols' Obesity

Nichols' second claim of reversible error is premised on the ALJ's failure to consider or address the impact of his severe obesity on his functional capacity.   Nichols cites to Social Security Ruling 02-1p (2002), which indicates that obesity can exacerbate the effects of other impairments, particularly the ability to sustain physical and mental activity over a full work week.   The Ruling also "instruct[s] adjudicators to consider the

---

[3]   "[A]t the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."   Soc. Sec. Rul. 83-10 (1983). Moreover, courts have noted that, as a vocational matter, unskilled jobs are "particularly structured so that a person cannot ordinarily sit or stand at will."   *Nelson v. Bowen*, 882 F.2d 45, 48-49 (2d Cir. 1989).

effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." *Id.* The court agrees that the ALJ did not comply with this instruction.

In response, the Commissioner argues that "[i]n total, the ALJ referenced Nichols' weight issues at least nine times in his decision," noting that the ALJ expressly recognized that: "obesity problem appears to play a significant role in [Nichols'] back pain." (AR 27.) While the ALJ did acknowledge Nichols' obesity several times in the opinion, it was cited primarily to show Nichols' supposed lack of motivation to heal himself. (AR 27.) The ALJ's opinion does not reflect any meaningful evaluation of the effects of obesity in conjunction with Nichols' disc disease and expected pain, or his ability to sustain regular work at a sedentary job without the opportunity to rest.

Citing the Seventh Circuit, the Commissioner also argues that an ALJ effectively accounts for a claimant's obesity when he adopts the limitations suggested by a physician who is aware of the obesity. See *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[T]he ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus . . . Skarbek's obesity, [] was factored indirectly into the ALJ's decision as part of the doctors' opinions."). Here, according to the Commissioner, Dr. Baumblatt "explicitly considered Nichols' obesity" and "the ALJ also indirectly accounted for Nichols's obesity by giving an RFC consistent with the opinion of Dr. Baumblatt." Neither of these statements is supportable -- it is impossible to tell what Dr. Baumblatt considered because he did not explain his decision (*see* AR 57,

AR 274), *and* the ALJ's decision did not incorporate -- or ever reference -- Dr. Baumblatt's opinion.

## III.  Failure to Properly Evaluate Nichols' Credibility

Nichols' third claim of reversible error turns on the ALJ's failure to properly evaluate his credibility.  An ALJ evaluates a claimant's alleged symptoms in a two-step, objective and then subjective analysis.  At this first step, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." Soc. Sec. Rul. 96-7p (1996).  In this respect, the ALJ ultimately conceded that Nichols' medical impairments *could* be expected to produce his claimed pain and symptoms.

At the second step, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  *Id.*  And the ALJ found that Nichols' "statements concerning the intensity, persistence and effects of her symptoms were not credible to the extent they [were] inconsistent with the . . . residual functional capacity assessment."[4]  (AR 25.)

---

[4]  The quoted phrase is one encountered frequently as a standard "template" in ALJ opinions.  This particular portion of the template, however, has recently been criticized by the Seventh Circuit Court of Appeals because it suggests "that ability to work is determined first and is then used to determine the claimant's credibility."  *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).  Despite the circuit court's valid concern, this court understands that the ALJ meant to say that he in fact considered the applicant's credibility as part of the functional capacity determination.

Since the ALJ is in the best position to observe witnesses, courts do not usually upset credibility determinations, so long as they find some support in the record and are not patently wrong. *Wolfe v. Shalala*, 997 F.2d 321, 326 (7th Cir. 1993). Even then, however, the ALJ must still build a logical bridge between the evidence and his conclusion, and may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it. Soc. Sec. Rul. 96–7p; 20 C.F.R. § 404.1529(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871–72 (7th Cir. 2000). "[A]n ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record. If the medical record does not corroborate the level of pain reported by the claimant, the ALJ must develop the record and seek information about the severity of the pain and its effects on the applicant." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (internal citations omitted).

In this case, the ALJ based his finding on his observation that (a) Nichols was treated conservatively; (b) there was no evidence Nichols was on strong narcotic pain medications that had any significant medication side-effects; (c) Nichols could prepare light meals, take his son to school, perform light household chores, and go shopping; and (d) Nichols had made no attempts to try and lose weight, despite being instructed to do so by his physicians. (AR 26-27.) Nichols argues that each one of these observations was unsupported or conclusory.

Specifically, Nichols attacks the ALJ's conclusion that "there is no credible evidence of regular usage of strong medication to alleviate pain that would significantly

impair the claimant's ability to do basic work activities."   Nichols' criticism here is misplaced, for the ALJ's discussion of the side effects of Nichols' medication seemed to be in the context of considering his capacity to work (despite the side effects), not in the context of assessing Nichols' credibility.

Nichols' other criticisms of the ALJ's credibility decision hit closer to home, however.   The ALJ discounted Nichols' pain claims in part because he was being "conservatively treated."   As previously noted, however, the ALJ fundamentally misconstrued the opinions of the neurosurgeons who consulted with Nichols regarding possible disc fusion or replacement surgery.   Rather than opining that Nichols did not need an operation to help his back pain, these surgeons stated that surgery was not recommended because it was unlikely to succeed.   (AR 230, 261, 280.)   These same surgeons recommended conservative treatment -- that Nichols lose weight in order to become a better candidate for an operation -- because it would both make Nichols a better candidate for surgery and would help his back, not because more ambitious treatments were unnecessary.   As for the ALJ's point that Nichols has not been prescribed a cane, Nichols nevertheless uses a cane without a prescription, and the cane is only relevant to some of his limitations.   Thus, the ALJ's discounting of Nichols' credibility on the basis of "conservative treatment" is largely unsupported by the evidence.

The ALJ also found Nichols' daily activities -- preparing light meals, taking his son to school, performing light household chores, and going shopping -- to be inconsistent with a finding of disabling pain.   (AR 27.)   As discussed, however, the ALJ failed to explain how these limited activities on a sporadic basis undermine Nichols' claim that he

could not work a full-time job on a sustained basis.  This was error as well.  *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (the failure of ALJs to recognize that there is a significant difference in performing activities of daily living with flexibility and opportunities for rest, and performing to the standards required by an employer at a full-time job "is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases").  Nichols primarily testified that he would not be able to work because he is unable to sit or stand in one place for extended periods, and often needed to lie down and elevate his feet.  Evidence of Nichols' daily activities are not inconsistent with this testimony.

Finally, the ALJ cited to the fact that Nichols had not lost weight as recommended by his physicians.  (AR 27.)  Nichols objects that the ALJ ignored his testimony that he had, in fact, tried to lose weight through both diet and exercise, but was unsuccessful because of his physical restrictions (AR 53).  He also cites *Barrett v. Barnhart*, 355 F.3d 1065 (7th Cir. 2004), for the proposition that an ALJ cannot treat a claimant's obesity as a sign of self-inflicted impairment unless the obesity can be readily fixed.  *Id.* at 1068. Nichols is correct.

The regulations provide that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  20 C.F.R. § 404.1530(a).  "The failure to do so without good reason will result in a denial of benefits."  20 C.F.R. § 404.1530(b).  Construing Nichols' failure to lose weight as non-compliance with a medical recommendation is a misuse of this regulation.  *Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000).  The Court of Appeals for the Seventh Circuit

has made clear that an administrative law judge cannot base his credibility determination on a claimant's failure to follow a recommendation where there is no evidence that the claimant would be restored to a non-severe condition if he actually followed the recommendation.   *Id.* at 813 (assessing ALJ's criticism of plaintiff's failure to quit smoking); *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985) ("Essential to a denial of benefits pursuant to Section 404.1530 is a finding that if the claimant followed her prescribed treatment she could return to work.").

Here, the surgeons indicated that they could not recommend surgical intervention because Nichols was obese.  Although they imply that if Nichols lost weight he could undergo surgery, there is no indication that surgery would restore his ability to work. *Rousey*, 771 F.2d at 1070 (finding no evidence that plaintiff's chronic obstructive pulmonary disease would become non-severe if she quit smoking).

In the case of smoking, the court of appeals has noted that even if the medical evidence establishes a direct link between smoking and the claimant's symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when he testifies that his condition is serious or painful.  *Shramek*, 226 F.3d at 813.

> Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health.  One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop.  This is an unreliable basis on which to rest a credibility determination.

*Id.* The same can be said of a claimant's failure to lose weight.  Given Nichols' inability to exercise, it is certainly not obvious that he is choosing to remain obese.

Perhaps not surprisingly, the Commissioner concedes that the ALJ "improperly cited to Nichols' failure to lose weight."  The Commissioner nevertheless argues that the error was harmless because other significant evidence supported the ALJ's credibility determination.  As just explained above, however, that is not the case and the error is not harmless given the many other errors committed in the ALJ's credibility analysis.  (AR 27.)

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Jason D. Nichols' application for disability insurance benefits is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment in favor of the plaintiff and close this case.

Entered this 21st day of October, 2013.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge